```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                         EASTERN DIVISION
```

UNITED STATES OF AMERICA,      )
                               )
             Plaintiff,        )
                               )
      v.                       )      No. 4:11 CR 413 JCH / DDN
                               )
JAMES W. HENDRIX,              )
                               )
             Defendant.        )

### ORDER AND RECOMMENDATION

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b).

Pending are the motions of defendant James W. Hendrix to suppress evidence (Docs. 15, 21), and the motion of the United States for a determination of the admissibility of any arguably suppressible evidence (Doc. 16). An evidentiary hearing was held on March 8, 2012. From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

### FACTS

1. On December 15, 2010, during the early morning hours of the night watch shift, St. Louis Metropolitan Police Officer Eugene Page, Jr.[1] was on patrol in the Third District, when he received a radio dispatch to go to 3232 California St. in the City of St. Louis. He was told that a phone caller had reported that someone was making methamphetamine in the basement of that location. Officer Page, a police training officer who was riding with him, and backup Officer Dave Glenn went promptly to that address.

2. Upon arriving, the officers went to the front door of 3232 California. Gov. Ex. 1. There they were met by a man who opened the front door and identified himself as Thomas Flynn. Flynn told the

---

[1] Officer Page graduated from the Police Academy in July 2003. His academy training included familiarity with various narcotics and how they were made. This training included methamphetamine and its chemical components.

officers that he was the one who called the police and that he rented 3232 California.  This residence had an entry area, an upstairs area, and a basement area.  From what Flynn said, the officers believed Flynn had the authority to allow them to enter the residence.  The officers then entered the residence with Flynn's permission.  Officer Page saw no one else on that level of the structure.

    3.    Inside, Officer Page asked Flynn what was going on.  Flynn said he believed a friend of his who lived downstairs in the basement[2] was down there making meth.  Flynn led the officers to the basement door, which was already open.  Flynn had not asked anyone for permission to admit the officers into the residence and he did not ask anyone for permission to take the officers to the basement.

    4.    At the door leading downstairs to the basement, the officers looked down the stairs.  Gov. Ex. 2.[3]  Officer Page told Flynn to remain upstairs, and he and the other officers walked down the stairs.  At the bottom of the stairs the officers could turn only to the right.  They did so and immediately entered a room; this was the first of a series of rooms linked by doorways in common walls.  Def. Exs. A, B, C, D, E, F, G, H, I.  There was no door in the entryway from the bottom of the stairs into the first room.

    5.    In the first of these rooms was a man, later identified as James W. Hendrix, who was sitting at a table.  On the table were a burner and a dish.  Another man was also present in this first room.  The room

---

[2]During the hearing, defense counsel showed Officer Page a copy of the police report of the incident that was written by another officer, Officer Pierson.  The report stated that Flynn said that Hendrix paid Flynn rent to live downstairs.  The prosecutor objected to the use of the report to prove that Hendrix paid rent for the downstairs room, because the report had been shown to Officer Page only to refresh his recollection and because another officer prepared this report.  When asked, Officer Page testified that Flynn may have told that to Officer Pierson, but he did not tell that to Page.

[3]Government Exhibit 2 depicts a set of stairs leading down.  At the bottom of the stairs is a large red and white traffic "STOP" sign.  Officer Page testified that he did not remember whether or not the stop sign was in place on the day of the incident.

at the end of the series of rooms in the basement contained a clothes washer and dryer; in the far wall of this room was a door that led outside. Def. Ex. I.

6. As the officers entered the first room, Officer Page saw Hendrix throw a bottle under a table. Page also saw in plain view on the table empty blisterpack sheets for packaging Wal-Act brand medication, which Page knew contained pseudoephedrine, a chemical component of methamphetamine. He also saw materials he believed were used in making methamphetamine, including containers of acetone, alcohol, and lye; lithium battery packs; a gallon of water; and a container of Coleman fluid. Gov. Exs. 4, 4A, 4B, 4C, 5, 5A, 5B, 5C, 6, 6A, 6B, 6C. Soon after the officers entered the room, Page smelled the aroma of ammonia. He believed these circumstances were the methamphetamine making about which Flynn had called the police.

7. Officer Page also knew from his training and experience that the making of methamphetamine created a health and safety hazard for people present in the area because of the risk of fire and explosion. Because of these risks, Officer Page next had the occupants of the basement, four in total, vacate the premises for their own safety. One of the four had been asleep in another room in the basement.

8. Once all the occupants were outside the building, and because of the health and safety risks, Officer Page and his supervisor called for the fire department's hazardous material unit to come and secure the residence. Officer Page's supervisor also called in Police Det. Charles Johnson who had been trained by the federal Drug Enforcement Administration in the operation of methamphetamine labs. Det. Johnson, his supervising sergeant, and another sergeant arrived and entered the basement of the residence. Det. Johnson saw and seized the plastic bottle of material,[4] depicted in Government Exhibit 6C.

9. Officer Page at no time, when he was in the basement of 3232 California, drew his weapon or threatened anyone. No officer threatened

---

[4]The contents of this bottle thereafter were chemically analyzed in a police lab and found to be a quantity of methamphetamine.

Thomas Flynn to get him to cooperate with the police, to direct them to the door that led to the basement, or to consent to the officers going into the basement.

10. Following the observation and the seizure of the contraband materials from Hendrix's room in the basement, Hendrix was arrested. Following his arrest, police seized a quantity of methamphetamine from his pants pocket. (See Doc. 21 at 2; Doc. 22 at 2.)[5]

### DISCUSSION

Defendant has moved to suppress the physical evidence seized by the police following their warrantless entry into defendant's room in the basement of 3232 California.

> The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. . . . Fourth Amendment rights, however, are personal and cannot be asserted vicariously. . . . Therefore, [defendant]'s standing to challenge the search of a third party's premises depends upon "whether government officials violated any legitimate expectation of privacy held by [defendant]." Rawlings v. Kentucky, 448 U.S. 98, 106 (1980).
>
> [Defendant] "has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." United States v. McCaster, 193 F.3d 930, 933 (8th Cir. 1999). Whether [defendant] had a subjective expectation of privacy is a question of fact . . . and whether that expectation of privacy was objectively reasonable is a question of law.

United States v. Perry, 548 F.3d 688, 690-91 (8th Cir. 2008).

Defendant argues that he had a reasonable expectation of privacy in the basement room in which he was found, because he was renting it from

---

[5]During the evidentiary hearing, no one testified about the formal arrest of defendant and the seizure of the contraband from his person. These facts, however, are described by the parties' briefs on the motion to suppress.

Mr. Flynn.[6] The record is not all that clear about whether or not defendant's room was sufficiently private to indicate that he had even a subjective expectation of privacy. The room was in the basement of 3232 California, and, while he lived in that room under some arrangement with Mr. Flynn, the subject room itself was the first of a series of rooms, each of which had a doorway that opened into the next through a common wall. The last room in this series contained a clothes washer and dryer, and a door that led immediately outside. Also, the entryway from the bottom of the stairs into the first room had no door to close for privacy from the upstairs area. Another person was found asleep in the room adjacent to defendant's.

The undersigned is unable to say from the record how much actual authority Mr. Flynn had to authorize the police to enter defendant's room. Nevertheless, the undersigned assumes, for the purpose of deciding the motion to suppress, that defendant had a subjective expectation of privacy in this room, because Fourth Amendment standing does not entirely depend upon property law restrictions. The "capacity to claim the protection of the Fourth Amendment depends not upon a property right in

---

[6]In this regard, defendant argues that the documentary police report, which is admittedly hearsay evidence, established that he had been paying money as rent for this room. The police report was orally described by defense counsel and Officer Page as stating that Mr. Flynn had told the reporting officer, Officer Pierson, and not Page, that defendant paid Flynn money as rent for his room in the basement. Because the issues raised by the pending motion to suppress involve the admissibility of evidence at trial, the Federal Rules of Evidence are not strictly applied to this pretrial proceeding. Fed. R. Evid. 104(a), 1101(d)(1). However, the police report was not offered into evidence or shown to the court during the hearing, but was shown only to Officer Page to refresh his recollection about the assertion that defendant paid rent for the room. Officer Page testified that Flynn never told him that. Even considering that the rules of evidence are not strictly applied in these proceedings, the hearing record is insufficient to reasonably ground a factual finding that defendant paid money for the room in the basement of 3232 California. Nevertheless, it is clear to the undersigned, and the undersigned so concludes for the purposes of this case, that defendant lawfully resided in the basement room where he was found. Defendant was a friend of Mr. Flynn who identified himself as the primary lessee of the relevant area of the building and who told the police that his friend lived in the basement and was making methamphetamine.

the invaded space but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded space." Rakas v. Illinois, 439 U.S. 128, 143 (1978).

Assuming defendant has standing to complain about the police entering his room without a warrant, the court next considers whether this entry violated the Fourth Amendment. In doing so, the court considers the totality of the circumstances immediately preceding the entry. Brigham City v. Stuart, 547 U.S. 398, 403 (2006). The government argues the warrantless entry of the police into defendant's room was justified because it was consented to and because there were exigent circumstances.

A warrantless entry and search may be justified as reasonable under the Fourth Amendment, if the entry was based upon consent that was voluntarily[7] given by someone with authority to consent. United States v. Matlock, 415 U.S. 164, 171 n. 7 (1974). Defendant argues that Mr. Flynn, upon whom the government's consent argument depends, did not have the authority to consent to the police entering his room. Proper third-party consent must be given by someone with authority over the area to be entered or other sufficient relationship to the area. Id. at 171. The Supreme Court stated the guiding principle thus:

> The authority which justifies the third-party consent . . . rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 171 n. 7. The government bears the burden of proving that Mr. Flynn had common authority over defendant's room. Illinois v. Rodriquez, 497 U.S. 177, 181 (1990).

---

[7]Voluntariness depends upon whether the subject's will was overborne and his ability not to consent was impaired. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). In this case, defendant does not argue that Mr. Flynn's consent was involuntary. Indeed, it was Mr. Flynn who called the police, told the officers about a meth lab operated by his friend in the basement, and directed them to the stairwell to the basement.

The requisite authority might be actual or apparent. The court knows very little about Mr. Flynn's relationship to defendant's room, other than defendant occupies this room with the permission of Mr. Flynn and the fact that the entry into defendant's room from the stairway is without a door. While other people apparently live in the series of rooms in the basement, it is unknown whether Mr. Flynn had authority to enter their rooms, perhaps to use or maintain the clothes washer and dryer in the last room of the series.

The court next considers whether Mr. Flynn had apparent authority over defendant's room. The answer to this issue depends upon whether the facts demonstrate a reasonable belief by the officers that Mr. Flynn had the necessary authority to consent to their entering defendant's room. Rodriquez, 497 U.S. at 182-84. The Fourth Amendment is not violated if the officers reasonably relied upon Mr. Flynn's apparent authority, even if he did not have the actual authority to consent to the officers' entry. The Fourth Amendment does not demand that the officers "always be correct, but that they always be reasonable." United States v. Clutter, --- F.3d ---, 2012 WL 987325, at * 2 (8th Cir. Mar. 26, 2012)(quoting Rodriquez, 497 U.S. at 185).

In the circumstances of this case, Officer Page and the other officers acted reasonably. When they arrived at 3232 California, they knocked on the front door and it was opened by a man who said he was Thomas Flynn who had phoned them earlier about a meth lab in his basement, operated by a friend of his. He then led the officers to the basement door, which was already open. Flynn had not asked anyone for permission to admit the officers into the residence nor to take the officers to the doorway leading to the basement stairs. His actions reasonably led the officers to believe that, like the woman in the doorway with the baby on her hip in Matlock,[8] Flynn showed he belonged in the residence and had sufficient authority over it, including the basement area, to further authorize the police to enter not only the residence generally but also to go downstairs to investigate the possibly

---

[8]See Georgia v. Randolph, 547 U.S. 103, 111 (1974)(Justice Souter adverting to the facts of Matlock).

criminal activity about which he had called them. United States v. Almeida-Perez, 549 F.3d 1162, 1170-71 (8th Cir. 2008). The officers' entry into the basement room of defendant was constitutionally authorized by the consent of Thomas Flynn.

The government strongly argues that the officers' warrantless entry into defendant's room was authorized also by the exigent circumstance of a substantial threat to the safety and welfare of persons by the presence of a meth lab. Warden v. Hayden, 387 U.S. 294, 298-99 (1967)("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."). Officer Page and the other officers knew from their training and experience that the operation of a meth lab presents a substantial risk of fire and explosion with possible injury to persons and property. Such a circumstance is of sufficient emergency to authorize a warrantless entry. United States v. Clarke, 564 F.3d 949, 959 (8th Cir. 2009).

However, before the officers could constitutionally act upon their belief that a meth lab was present, their belief had to be supported by probable cause, i.e., facts upon which "a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." Id. (quoting Kleinholz v. United States, 339 F.3d 674, 676 (8th Cir. 2003)(per curiam). In Clarke and Kleinholz, probable cause was established by an anonymous tip and the smelling of the odor of a known component of methamphetamine. Kleinholz, 339 F.3d at 677; Clarke 564 F.3d at 959. In the instant case, before they actually entered defendant's room the officers knew about the meth lab only from what their known informant, Thomas Flynn, told them.

Mr. Flynn's information to the police before they entered defendant's room, plus the other circumstances, occurring before they entered defendant's room, gave them probable cause to believe a meth lab was present which presented the risk of fire and explosion. First of all, the source of the officers' information, Thomas Flynn, was not an anonymous tipster. He identified himself to the officers by name on the phone, he gave them a specific address, he was present at this address when the officers arrived shortly thereafter, and he appeared to have

- 8 -

authority to allow them to enter the residence and go to the basement and enter defendant's room.

While most findings of probable cause following tips include other information that corroborates the tip, such corroboration is not always necessary. This is especially true in cases involving substantial risk of imminent danger to persons and property. In United States v. Spotted Elk,[9] tribal police Officer Whary received a 911 call that a woman was being assaulted at a specifically identified trailer home. When Officer Whary arrived, other officers were already on the scene and they told him that Justin Hawk Wing just told them that a named woman was flashing a knife, was looking for her boyfriend, and was threatening others inside the residence. The officers also told Officer Whary that Hawk Wing invited the officers to enter the trailer. When Officer Whary entered the trailer, he saw many items of contraband in plain view. 548 F.3d at 650-51. The Eighth Circuit overruled the argument that there was no factual support for the report to the police that anyone had been assaulted or injured. The Eighth Circuit concluded that the statement by Hawk Wing on the scene justified Officer Whary's entrance into the trailer "in order to prevent violence and restore order." Id. at 652.

The statements made by Thomas Flynn twice, once on the phone and next at the indicated address, plus his exercise of his apparent authority and interest in safeguarding this residence gave the officers probable cause to go downstairs and enter defendant's room without a judicial warrant.

Whether by consent of Thomas Flynn or because they were prompted by the substantial risk of danger in the context of probable cause, Officer Page and the other officers lawfully entered defendant's room through the doorless entryway. Once lawfully in his room, they observed the plethora of incriminating objects in plain view, which, in the totality of the circumstances leading to their entry into the room, they reasonably believed were involved in criminal activity and could thus be seized without a warrant. Kleinholz, 339 F.3d at 677.

---

[9]548 F.3d 641 (8th Cir. 2008).

The totality of the circumstances also provided probable cause to arrest defendant without a warrant for at least possessing methamphetamine.[10] The facts supporting probable cause to arrest were the circumstances that led them into the first basement room, defendant's presence among the incriminating objects, Officer Page's smelling the odor of methamphetamine chemical precursor ammonia, and the sight of defendant tossing a bottle under the table as soon as the officers entered the room.

Following defendant's lawful arrest, the police were authorized to search his person without a warrant and to seize the quantity of methamphetamine from it. Items may be seized without a warrant, if seized incident to a lawful arrest. United States v. Edwards, 415 U.S. 800 (1974) (clothing taken from arrestee at police station is seized incident to the arrest); United States v. Robinson, 414 U.S. 218, 235 (1973).

For these reasons,

**IT IS HEREBY RECOMMENDED** that the motions of defendant James W. Hendrix to suppress evidence (Docs. 15, 21) be denied.

**IT IS HEREBY ORDERED** that the motion of the United States for a determination of the admissibility or not of any arguably suppressible evidence (Doc. 17) is denied as moot.

The parties are advised they have until close of business on April 16, 2012 to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

                                                 /S/    **David D. Noce**
                                      **UNITED STATES MAGISTRATE JUDGE**

Signed on March 30, 2012.

---

[10]Probable cause to arrest without a warrant exists when the police have information sufficient to cause a reasonable person to believe that the subject had committed an offense or was then committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964).